IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CHERYL E. KRUM,<br><br>Plaintiff,<br><br>vs.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,<br><br>Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br>Case No. 2:11-cv-932 |

Plaintiff Cheryl E. Krum has filed an action against Defendant Hartford Life and

Accident Insurance Company (Hartford) in which she alleges that her long-term disability

benefits were inappropriately denied her by Hartford in violation of the Employee Retirement

Income Security Act (ERISA).  The matter is now before the court on Ms. Krum's Motion for

Summary Judgment (Dkt. No. 19).  Because the court agrees with Ms. Krum that the denial of

her disability benefits was an abuse of discretion, her motion is GRANTED.

BACKGROUND[1]

Ms. Krum worked for many years as a registered nurse for Intermountain Healthcare

(Intermountain) at the Utah Valley Regional Medical Center.  (R. at 402.)  She began work in

1995 and continued working until October 30, 2009, when she was sixty years old.  (R. at 410.)

During the four years before she stopped working, Ms. Krum found it more and more difficult to

---

[1]The facts are taken from the Administrative Record that was submitted to the court.  (*See* Dkt. No. 23.)

perform her nursing duties because she was increasingly short of breath and suffering from arthritis.  (R. at 403.)  As a result, Ms. Krum left her job and applied for long-term disability (LTD) benefits from Hartford.[2]  The LTD benefits were a feature of a Group Policy that Intermountain maintained with Hartford.  Under the terms of the Group Policy, a claimant is eligible for benefit payments provided that the claimant meets the Group Policy's definition of disability.  At first, a claimant must show that she is prevented from performing one or more of the essential duties of her own occupation.  But after twelve months, the claimant must show that she cannot perform the essential duties of "Any Occupation."  (R. at 20.)  The Group Policy defines any occupation as follows:

> Any Occupation means any occupation for which You are qualified by education, training or experience and that has an earnings potential greater than the lesser of:
>
> 1)    the product of Your Indexed Pre-disability Earnings and the Initial Benefit Period Percentage; or
>
> 2)    the Maximum Monthly Benefits.

(R. at 19.)

Hartford received a completed LTD claim application from Ms. Krum on February 23, 2010.  (R. at 341; 410-18.)  This application included an Attending Physician's Statement (APS) from Dr. Michael Pearce, who was Ms. Krum's treating physician.  In his report, he diagnosed Ms. Krum with constrictive bronchiolitis, rheumatoid arthritis, and obstructive sleep apnea.  (R. at 407.)  Dr. Pearce also indicated that the "[e]xpected duration of any current restriction(s) or limitation(s)" was "unknown."  (R. at 408.)  Internal notes for Hartford dated March 4, 2010,

---

[2]Ms. Krum also applied for and received short-term disability benefits from Hartford, but these benefits were determined under a different policy and are not the subject of this dispute.

indicate the following initial impressions of Ms. Krum's condition:

> [Employee is] unlikely to [return to work] due to constrictive bronchiolitis, a non-reversible obstructive lung disease.  [Employee is] comorbid with [rheumatoid arthritis] and [obstructive sleep apnea]. . . .  [Attending Physician] noted [that the employee] is unable to walk a few hundred feet without stopping to catch breath. . . . Her condition is chronic and progressive and unlikely to improve.

(R. at 65-66.)

On March 9, 2010, Hartford approved Ms. Krum's LTD application and told her that her benefits would begin on May 1, 2010.  (R. at 116-19.)  Hartford also asked Ms. Krum to provide proof of her application for Social Security Disability (SSD) benefits.  (R. at 116.)  Under the terms of the Group Policy, Hartford was entitled to reduce its payment to a disabled employee by the amount of SSD benefits that the employee received.  (R. at 17-18.)  Hartford asked Ms. Krum to provide this material promptly to "avoid any delays in processing [her] claim for benefits." (R. at 117.)  Ms. Krum was awarded SSD benefits on June 29, 2010, which were made retroactive to become effective at the beginning of April 2010.  (R. at 224.)  Social Security awarded Ms. Krum a monthly benefit of $1,396.00, which was then applied to reduce Hartford's monthly liability under the policy from $2,512.92 to $1,116.92.  (R. at 109, 119, 224.)  Since Hartford had paid Ms. Krum the full amount under the policy from May 1, 2010, to July 31, 2010, Ms. Krum refunded to Hartford under the terms of a Repayment Agreement the overpayment she received from her SSD benefits during these three months.  (R. at 111.)[3]

On November 4, 2010, Ms. Krum received a letter from Hartford reminding her that she would only continue to receive LTD benefits after the year-long period ending on May 1, 2011, if

---

[3]The parties do not dispute that Ms. Krum repaid Hartford its offset for her SSD benefits under the terms of the LTD policy and the Repayment Agreement.

she could show that she was disabled from performing "Any Occupation," and not just her own occupation, as those terms were defined under the LTD policy.  (R. at 101.)  Hartford informed Ms. Krum that it had begun its review to determine whether she would continue to qualify for benefits after May 1, 2011, and asked Ms. Krum to send an updated APS from her doctor.  (*Id.*)

Dr. Pearce submitted a new APS on December 3, 2010.  (R. at 267-68.)  He described the findings from Ms. Krum's physical examination as "globally decreased breath sounds."  One of the questions on Hartford's APS form asked Dr. Pearce to mark the number of hours that a patient would be able to sit, stand, or walk in a "general workplace environment."  Dr. Pearce marked "8" under the column for "Sit" and did not mark anything under the columns for "Stand" and "Walk."  (R. at 268.)  Dr. Pearce stated that Ms. Krum could occasionally (1-33% of the time) lift up to twenty pounds and that she did not have any psychiatric or cognitive impairments. (*Id.*)  The form also asked: "Can the patient participate in vocational rehabilitation services (this may include worksite accommodations, identifying alternative work, and or retraining assistance)?"  Dr. Pearce marked "No."  (*Id.*)  He stated that the expected duration of Ms. Krum's condition was "lifelong."  (*Id.*)

On January 15, 2011, Hartford sent copies of Dr. Pearce's APS to Ms. Krum's two other primary treating physicians: Dr. Scott Bingham and Dr. Richard Call.[4]  Both doctors stated that they agreed with the restrictions and limitations described by Dr. Pearce in his APS.  (R. at 271-72.)  Hartford's internal notes from this time summarize Dr. Pearce's APS as follows:

[Dr. Pearce] states [Ms. Krum] may sit up to 8 hours, may occasionally lift up to

---

[4]Ms. Krum was also seen by Dr. Call's son, Dr. Steven Call, who practices in the same office.  It is not always clear whether references to Dr. Call in the record refer to Dr. Richard Call or Dr. Steven Call, but the court has not found any instance where this distinction is material.

4

> 20 lbs and states no other restrictions are in place.  [As detailed in her Claimant
> Questionnaire, Ms. Krum] remains able to quilt and sew at home.  She reports she
> is able to fix meals for herself and her family.

(R. at 62.)

On February 11, 2011, Hartford assigned Ms. Krum's file to Sue Brooks Sweet to prepare an Employability Analysis Report.  Ms. Sweet submitted her report on February 17, 2011, in which she concluded that Ms. Krum retained the ability to perform sedentary work.  (R. at 276.) Ms. Sweet identified a number of sedentary occupations that she believed (1) fell within the scope of Ms. Krum's education, training, and experience; (2) could be performed subject to the restrictions and limitations that Dr. Pearce had identified; and (3) had a wage level at or above the minimum wage requirement for the Group Policy's definition of disability.  (R. at 278.)  Ms. Sweet's search returned four occupations classified by the Occupation Access System (OASYS)[5] as "Good," 61 occupations classified as "Fair," and 410 occupations classified as "Potential." (R. at 278.)  These classifications were based on Ms. Krum's physical restrictions that Ms. Sweet entered into the system, as well as Ms. Krum's work and educational history.  (*Id.*)  The occupations that Ms. Sweet identified as "Good" were: "Cardiac Monitor Technician," "Director, Nurses' Registry," "Utilization-Review Coordinator," and "Director, Volunteer Services."  (*Id.*)

Sarah Andrews, the Ability Analyst who was assigned to Ms. Krum's claim, reviewed Ms. Sweet's Employability Analysis Report and the information received from Ms. Krum's treating physicians.  Based on this information, Ms. Andrews concluded that Ms. Krum "would not meet the definition of disability for any occupation" and recommended that Ms. Krum's LTD

---

[5]OASYS is "a computerized job matching system that cross references an individual's qualifications profile with occupations classified by the U.S. Department of Labor in the Dictionary of Occupational Titles."  (R. at 276.)

benefits be terminated after May 1, 2011.  (R. at 58.)  Ms. Andrews's recommendation was

reviewed and affirmed by Brian Cain, a Hartford Examiner, who summarized the evidence

supporting Ms. Krum's claim as follows:

> Based on medical update with current restrictions from Dr. Pearce, Pulmonary
> specialist, [Ms. Krum is] able to sit 8 hours in general workplace and occasionally
> lift up to 20 [pounds]. [The treating physician's] consensus on current [restrictions
> and limitations] was confirmed from all treating providers, including Dr. Bingham
> and Dr. Call.  Based on functionality and [education and work history], [the
> Employability Analysis Report] identified several occupations for Any
> Occ[upation] prevalent in national economy.  Therefore, based on current info in
> file, [Ms. Krum] will no longer meet definition of Disability as of . . . 5/1/11 and
> no benefits are payable beyond 4/30/11.

(R. at 59.)

In a letter dated March 18, 2011, Hartford terminated Ms. Krum's LTD benefits as of

May 1, 2011.  (R. at 90-94.)  Hartford explained to Ms. Krum that it had found that she was not

prevented from performing the essential duties of "Any Occupation" and that she did not meet

the policy definition of disability as a result.  (R. at 93.)  Ms. Krum appealed Hartford's decision

on May 31, 2011.  (R. at 138-140.)  In a letter to Hartford, Ms. Krum explained that she would

have appealed the decision sooner but that she did not receive Hartford's March 18, 2011, letter

until May 10, 2011.  (R. at 140.)  Ms. Krum related her medical condition and stated that

pulmonary tests taken in January 2011 showed that she only had 35% of her lung function.  (R. at

138.)  She also wrote that she used a continuous positive airway pressure (CPAP) machine for

twelve hours at night and described her daily activities:

> My normal days [sic] activity consists of personal hygiene/bath, followed by using
> CPAP for 20 minutes to recover.  I then go on concentrated oxygen with a nasal
> cannula to go downstairs to get breakfast but must first sit for 5-10 minutes to
> recover from energy used going down the stairs.  I am unable to complete any task
> without many rests or recovery periods. . . .  I could not take care of myself

without my husbands [sic] help.

(R. at 139-40.)

Ms. Krum included with her appeal an additional APS from Dr. Pearce.[6]  Under a section

for Physical Impairment, Dr. Pearce marked "Class 5" as the level of Ms. Krum's condition:

"severe limitation of function [sic] capacity; incapable of minimum (sedentary [as defined in

Federal Dictionary of Occupational Titles]) activity."  (R. at 173.)  He noted that "Ms. Krum

cannot walk more than 30 ft.  Requires high level of supplemental [oxygen]."  (*Id.*)  He also

marked "Class 4 (complete limitation)" as her cardiac condition and "Cannot perform ordinary

physical activity" as her pulmonary condition.  (R. at 174.)  Dr. Pearce checked the "Yes" box to

the question, "Is patient NOW totally disabled and unable to perform any other work?" and

checked "Never" to a question about when Ms. Krum would likely recover.  (*Id.*)  Finally, Dr.

Pearce stated in his remarks: "Mrs. Krum has had gradual progress of her disease.  She is no

longer able to work at any job and is not expected to improve or return to any work."  (*Id.*)

On June 6, 2011, Hartford received Ms. Krum's appeal and assigned her case to one of its

Appeal Specialists, Pina Gulino.  (R. at 88.)  Ms. Gulino prepared a description of the grounds of

Ms. Krum's appeal and recorded that Ms. Krum had "submitted documentation from the same

provider [Dr. Pearce] disputing his prior statement."  (R. at 55.)  Ms. Gulino then wrote to Ms.

Krum asking her to provide medical records from Dr. Pearce, Dr. Call, Dr. Bingham, and any

other treating physicians that she had seen since January 1, 2010.  Ms. Gulino stated that she

would send the records to University Disability Consortium (UDC) for review after Hartford

---

[6]This form, labeled an "Attending Physician's Statement of Disability," does not appear
to have been created by Hartford.  (*Compare* R. 173-74 *with* R. 267-68.)

received them.  (*Id.*)  Hartford received the records a few weeks later and referred Ms. Krum's

file to UDC on July 6, 2011.  Ms. Gulino asked the independent reviewing physician to answer

two questions: "(1) Please define any functional limitations as of 5/1/11 and beyond; (2) Are

there any limitations due to medications?"  (R. at 325.)  Hartford paid UDC $700 for its review

of Ms. Krum's file.  (R. at 144.)

Ms. Krum's records were reviewed by Dr. Nneka Onwubueke, a UDC physician who is

Board Certified in Internal Medicine.  (R. at 145-52.)  Dr. Onwubueke did not personally

examine Ms. Krum, but instead relied on the reports from Ms. Krum's treating physicians and

phone conversations that Dr. Onwubueke had with those physicians.  (*Id.*)  Dr. Onwubueke first

reviewed the information discussed above: the two initial APS forms signed by Dr. Pearce, Dr.

Bingham and Dr. Call's agreement with these forms, and the additional APS from Dr. Pearce

dated May 26, 2011.  Referring to the latest APS, Dr. Onwubueke stated that Dr. Pearce

> indicated severe limitation of functional capacity, incapable of minimal
> [sedentary] activity.  He noted that Ms. Krum could walk more than 30 feet[7] and
> required a high level of supplemental oxygen.  In terms of cardiac limitations, he
> indicated complete limitation.  For pulmonary, he noted that she could not
> perform ordinary physical activity.  She was, in his opinion, now totally disabled
> from performing her own job and from performing any other work.

(R. at 146.)

Dr. Onwubueke then reviewed two office visits that Ms. Krum had with Dr. Pearce.

During a visit on March 14, 2011, Ms. Krum reported feeling better in terms of her lungs and

having a little extra energy during the day.  (R. at 147.)  But Dr. Pearce noted that Ms. Krum had

---

[7]Dr. Pearce actually stated that Ms. Krum could *not* walk more than thirty feet.  (R. at 173.)  Given the context in which Dr. Onwubueke's statement was made and the fact that she accurately recited Dr. Pearce's other observations, the court finds that Dr. Onwubueke meant to state that Ms. Krum could not walk for more than thirty feet.

decreased breath sounds in all lung fields and that she was using her CPAP often during the day

to help her breathe.  (*Id.*)  The second visit that Dr. Onwubueke reviewed occurred on May 26,

2011, the same day that Dr. Pearce completed his most recent APS.  Dr. Onwubueke summarized

this visit as follows:

> [Ms. Krum] was doing about the same as on her last visit.  She could only walk
> 10-20 feet before her oxygen saturations would drop off and she would have to
> stop and rest.  She was generally on 3 liters of oxygen with her oxygen saturations
> being around 90%.  She would require up to five liters of oxygen to maintain her
> saturations when she is more active. . . .  Assessment was severe COPD [chronic
> obstructive pulmonary disease] secondary to probable constrictive bronchiolitis
> due to rheumatoid arthritis.

(R. at 147-48.)  Dr. Onwubueke noted that, "[p]er records, [Ms. Krum's] pulmonary function

tests had shown an FEV1 [forced expiratory volume in one second] of 35% of normal."  (R. at

151.)

Dr. Onwubueke also reviewed records from Dr. Call, who was Ms. Krum's

rheumatologist.  These notes stated that she had "low back pain," that she had been referred to

another doctor for "spinal stenosis, which was said to be severe," that she "was said to be doing

fair overall" and that she "had numbness and tingling in both feet."  (R. at 148.)

Finally, Dr. Onwubueke summarized the phone conversations that she had with Ms.

Krum's three treating physicians.  According to Dr. Onwubueke, Dr. Pearce confirmed that Ms.

Krum was on oxygen twenty-four hours a day, seven days a week: "He stated that when she

comes to her visits, sometimes when she walks from the waiting room to the examination room,

despite use of oxygen, her oxygen levels could drop to the low 80s."  (*Id.*)  Dr. Onwubueke asked

Dr. Pearce why Ms. Krum had been doing worse during her May 26, 2011, visit as compared

with her visit on March 14, 2011.  "Dr. Pearce stated that he was not sure why she was doing

worse at the time.  He did note that her condition does tend to fluctuate." (R. at 149.)  Dr. Onwubueke also questioned Dr. Pearce about whether Ms. Krum could perform work at a sedentary level.  He responded that "at best, she may be able to perform work at a sedentary level of effort, but also stated that it would be difficult for her to get back and forth from work due to her problems with low oxygen levels and her respiratory difficulties." (*Id.*)  Dr. Pearce noted that sitting might be quite difficult for Ms. Krum due to her arthritis.  (*Id.*)  According to Dr. Onwubueke, Dr. Pearce stated later in their conversation that "if he had to fill out a form with regard to [Ms. Krum's] work ability, he would have to say that she was not able to perform even sedentary level work." (*Id.*)

Dr. Onwubueke also called Ms. Krum's rheumatologist, Dr. Call.  Dr. Call stated that Ms. Krum "could not walk without being short of breath." (*Id.*)  Focusing on Ms. Krum's back pain, he stated that "her back problem would be the more limiting issue compared with her rheumatoid arthritis" and estimated that "she might be able to sit for one hour at a time, after which she may require a brief break to move around." (R. at 150.)  Finally, Dr. Bingham informed Dr. Onwubueke that Ms. Krum's limitations "were not on a cardiac basis" but noted that Ms. Krum had "pulmonary difficulties." (*Id.*)

Based on all the information that she reviewed, Dr. Onwubueke found that

Ms. Krum was and is limited to performing work that is at the sedentary level of effort.  It is my opinion that she retains the ability to perform work at this level of effort on a full time basis. . . .  Work environment will need to be conducive to the use of Oxygen while working.  She will do better with slow-paced work activities, which will imply less oxygen demand.  She is likely to have exacerbations of her COPD, which may be unpredictable.  At those times, she may not be able to work effectively.

(R. at 151.)  Dr. Onwubueke also assessed Ms. Krum's arthritis and back pain:

> [I]t is my opinion that Ms. Krum should retain the ability to sit for eight hours total per workday.  She would however require the ability to change positions as needed for comfort including brief periods of standing and ambulation, as she deems necessary.  It is my opinion that she should retain the ability to reach at desk level on a constant basis.  She should have the ability to feel, finger, and handle at least frequently.

(R. at 151.)

On August 2, 2011, Ms. Gulino wrote to Ms. Krum to tell her that, after its review of her appeal, Hartford maintained its position that Ms. Krum was no longer qualified for LTD benefits because she no longer met the policy definition of "Disability from Any Occupation."  (R. at 77.) Ms. Gulino provided a summary of the grounds for the appeal determination, including a description of the evidence that Hartford had used, relevant sections of Dr. Onwubueke's report, and the relevant provisions of the Group Policy.  (R. at 77-82.)  Ms. Gulino informed Ms. Krum that her "functionality as determined by the independent medical reviewer [Dr. Onwubueke] was compared to the prior Employability Analysis Report of February 16, 2011" and then listed for Ms. Krum a number of the occupations that were determined to be within Ms. Krum's functional capabilities as well as her work and educational experience.  (R. at 81.)  These occupations included the four occupations that were classified as "Good" under the first OASYS analysis that Ms. Sweet performed.  (*Compare* R. 81 *with* R. 278.)

In Ms. Gulino's summary of the evidence that Hartford reviewed from Dr. Pearce, she told Ms. Krum that "Dr. Pearce indicated you cannot work more than thirty hours, you required oxygen, and he opined that you had a progression of your disease . . . ."  (R. at 79.)  Ms. Gulino's statement contained an error.  Dr. Pearce did not indicate that Ms. Krum could not work more than thirty hours, but that she could not walk more than thirty feet.  (R. at 303.)  On August 19,

11

2011, Ms. Krum wrote to Hartford and pointed out this error.  (R. at 133.)  She did not receive a

response.  Ms. Krum also requested documents compiled by Hartford in connection with her

claim and then timely filed the appeal that is now pending before this court.

ANALYSIS

**A.  Standard of Review**

Ms. Krum brings her claim against Hartford under ERISA § 502(a)(1)(B), 29 U.S.C.

§ 1132(a)(1)(B), which allows the beneficiary of an ERISA plan to "recover benefits due to [her]

under the terms of [her] plan."  *Id.*  A court generally employs a *de novo* standard of review to

evaluate a claim under ERISA unless the policy documents contain language that grants

discretion to the fiduciary of a plan to interpret the terms of the plan and to determine eligibility

for benefits.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Here, the parties

do not dispute that the Group Policy administered by Hartford contains language granting

Hartford this discretion.  (R. at 19.)  Accordingly, the court reviews Hartford's eligibility

determination under the more deferential abuse of discretion standard.  *See, e.g.*, *DeGrado v.*

*Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1167 (10th Cir. 2006).  Under this standard, the

court's review is limited to "determining whether the . . . interpretation [of the plan] was

reasonable and made in good faith."  *Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 1003

(10th Cir. 2004).

Ms. Krum argues that the court should decrease the level of deference afforded to

Hartford because of Hartford's position as both the insurer and plan administrator.  The court is

not persuaded by Ms. Krum's argument even though it is undisputed that Hartford, because of its

dual role, operates under an inherent conflict of interest.  *See Welch v. Unum Life Ins. Co. of Am.*,

12

382 F.3d 1078, 1087 (10th Cir. 2004) (finding a conflict of interest under similar circumstances). As both insurer and plan administrator, Hartford "may favor, consciously or unconsciously, its interests over the interests of the plan beneficiaries." *Fought*, 379 F.3d at 1003. But the Supreme Court expressly considered the effect of an inherent conflict of interest on the appropriate standard of review and held that, while a judge should take into account the conflict of interest as a factor in its decision, the court should still apply an arbitrary and capricious standard. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008) (holding that it is not "necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules focused narrowly upon the evaluator/payor conflict").

Under the Supreme Court's decision in *Glenn*, a court may "tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together." *Id.* at 117. A conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy. . . ." *Id.* Here, Hartford argues that it has taken appropriate steps to insulate its claims personnel from any consideration of Hartford's finances. The court notes that it is difficult to evaluate Hartford's assertion, as it is unsupported by any evidence independent of Hartford's own affirmations. (*See* Excerpts from Hartford's Discovery Responses, Def.'s Mem. Opp., Ex. A, Dkt. No. 27.) But the court need not make any findings about Hartford's success in reducing its potential bias because it finds that Hartford's decision to terminate Ms. Krum's benefits was inappropriate even in the absence of a conflict of interest.

**B. Evaluation of Hartford's Decision**

The court finds that, for a number of reasons and given the totality of the circumstances, Hartford's decision to deny Ms. Krum LTD benefits must be overturned even under a deferential standard of review.

1.  Hartford's Failure to Consider the Award of Social Security Disability Benefits

Ms. Krum points out that Hartford required her to apply for SSD benefits, reduced its share of the benefits it owed Ms. Krum by the value of the benefits she received from the Social Security Administration (SSA), and then ignored the SSA's determination that she was disabled when Hartford concluded that she could still perform sedentary work. The court agrees that Hartford's failure to distinguish or even discuss the Social Security award in its decision to terminate Ms. Krum's benefits is problematic.

An award of SSD benefits is not necessarily determinative of a benefit claim under an ERISA plan, because there are "critical differences between the Social Security disability program and ERISA benefit plans." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003). And the Tenth Circuit, in a number of unpublished opinions that the court cites as persuasive though not controlling precedent, has held that Social Security disability "proceedings are entirely different and separate from a claim under ERISA, with different parties, different evidentiary standards, and different bodies of law governing their outcomes." *Wagner-Harding v. Farmland Industries, Inc. Employee Retirement Plan*, 26 Fed. App'x 811, 817 (10th Cir. 2001) (unpublished); *see also Brown v. Hartford Life Ins. Co.*, 428 Fed. App'x 817, 821 (10th Cir. 2011) (upholding a plan administrator's decision even though the plan administrator failed to consider the SSA's disability finding).

14

But even if the SSA's determination is not dispositive, it is still persuasive evidence that Ms. Krum is, in fact, unable to work.  As discussed below, Hartford's original decision that Ms. Krum did not qualify for benefits under the any occupation standard was almost exclusively based on three short indications from Dr. Pearce that she could sit for up to eight hours a day, could occasionally lift up to twenty pounds, and had no psychiatric or cognitive impairments. Given the paucity of evidence supporting the argument that Ms. Krum could work, Hartford's failure to consider countervailing evidence that the SSA had determined that Ms. Krum was disabled is especially troublesome, and it is equally concerning that Hartford still declined to address the SSA award after Ms. Krum contested Hartford's original decision.  After all, the disability standard applied by the SSA is not an easy one.  To qualify for SSD benefits, Ms. Krum had to demonstrate that she was unable, "considering her age, education and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives."  42 U.S.C. § 423(d)(2)(A).  While Hartford may reasonably believe that a person meeting the Social Security Disability standard does not necessarily meet the any occupation standard under its Group Policy, its failure to offer any explanation of why it believes this statement is true for Ms. Krum's case is a factor counseling reversal.

Other courts have similarly found that a plan administrator's failure to consider a disability finding from the SSA is a factor supporting the reversal of a plan administrator's decision.  Most notably, the Supreme Court in the *Glenn* case emphasized this factor when it affirmed the decision of the Court of Appeals to reverse a plan administrator's decision.  The Supreme Court, addressing the weight that had been given to a conflict of interest, found that the

15

Court of Appeals

> focused more heavily on other factors.  In particular, the court found questionable
> the fact that MetLife had encouraged Glenn to argue to the Social Security
> Administration that she could do no work, received the bulk of the benefits of her
> success in doing so (the remainder going to the lawyers it recommended), and
> then ignored the agency's finding in concluding that Glenn could in fact do
> sedentary work.  The course of events was not only an important factor in its own
> right (because it suggested procedural unreasonableness), but also would have
> justified the court in giving more weight to the conflict (because MetLife's
> seemingly inconsistent positions were both financially advantageous.

*Glenn*, 554 U.S. at 118.  Here, the court agrees that Hartford's failure to address Ms. Krum's

SSA award is evidence of procedural unreasonableness.

### 2.  Hartford's Failure to Consider Important Evidence in the Record in Its Initial Review

The court is additionally concerned that Hartford was selective in its review of Ms.

Krum's records.  In its original decision to terminate Ms. Krum's benefits, Hartford relied

heavily on Dr. Pearce's APS, as well as statements from Dr. Bingham and Dr. Call that they

agreed with Dr. Pearce's findings.  As Ms. Andrews summarized in her review concluding that

Ms. Krum did not meet the definition of disability for any occupation, Ms. Krum's treating

physicians agreed that Ms. Krum could sit for eight hours a day and could occasionally lift up to

twenty pounds.  Ms. Andrews then noted that, based on these restrictions and limitations, the

Employability Analysis Report provided several jobs for which Ms. Krum would be qualified by

her training, education, and experience.  In her analysis, Ms. Andrews failed either to consider or

address that Dr. Pearce had marked "No" to the following question on the APS: "Can the patient

participate in vocational rehabilitation services (this may include worksite accommodations,

identifying alternative work, and or retraining assistance)?  Ms. Andrews did not mention that the

expected duration of Ms. Krum's condition was "lifelong" and did not discuss any of the specific

findings that Dr. Pearce made about Ms. Krum's condition, including her "globally decreased breath sounds."

While none of these additional pieces of information would necessarily have required Hartford to change its evaluation, Hartford's failure at least to address the implications of Dr. Pearce's findings is notable given the reliance that Hartford placed on Dr. Pearce's other findings that Ms. Krum could sit and lift up to twenty pounds.  The court is especially troubled that Hartford did not discuss Dr. Pearce's statement that Ms. Krum would be unable to participate in any vocational retraining in its preparation of the Employability Analysis Report or at any future time.  This limitation puts Dr. Pearce's statement that Ms. Krum could sit for eight hours a day in a different light.  And while Hartford emphasizes the number of hours that Ms. Krum could sit, it fails to point out that Dr. Pearce left blank the spaces for how long Ms. Krum could stand or walk in the workplace.  Dr. Pearce presumably believed that Ms. Krum would not be able to stand or walk at all due to her breathing difficulties.  Other courts have reversed plan administrator decisions for plaintiffs with similar statements from their attending physicians. *See, e.g.*, *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356 (6th Cir. 2002) (holding that a plan administrator's decision to deny benefits was arbitrary and capricious even though an attending physician had submitted a form stating the plaintiff could sit for six hours, stand for two hours, and walk for two hours).

The court does not intend to suggest that someone is unqualified for work simply because an attending physician says that she cannot stand or walk at the workplace.  The court is more concerned that Hartford based its decision on a form that conveyed limited information without performing any additional inquiry and while ignoring relevant counter evidence on the same

form.  If the only prerequisites for sedentary work are that an employee can sit for up to eight hours and lift up to twenty pounds, it is difficult to believe that any but the most severely disabled claimants would ever qualify for benefits.  Hartford's focus on only certain aspects of Dr. Pearce's report strikes the court as an example of cherry-picking information from a rather barren tree.

The court is also troubled by the format of the APS form itself, since it provided few questions and left almost no space for a doctor to elaborate on a patient's physical functionality. Instead, the APS merely asks the evaluating physician to state how long a patient could sit, stand, and walk in a workplace environment and how often a patient can perform certain actions, such as lifting, bending, kneeling, and reaching.  (*See* R. at 199.)  A later APS provided by Dr. Pearce, which does not appear to have been issued by Hartford, asks a treating physician to give more detailed information about a patient's physical impairment, cardiac condition, and pulmonary condition.  (R. at 173-74.)  Dr. Pearce's observations on this later form provide a more complete picture of Ms. Krum's health and capabilities than his earlier assessment.  While Hartford refers to Dr. Pearce's May 26, 2011, APS as "documentation . . . disputing his prior statement"  (R. at 55), the court finds that Dr. Pearce's observation on this later APS that Ms. Krum was "totally disabled" is not inconsistent with his earlier statement that she could sit for eight hours a day and lift twenty pounds, especially since Dr. Pearce also stated in the earlier form that Ms. Krum could not participate in any vocational rehabilitation.

### 3.  Hartford's Failure to Consider Important Evidence in the Record on Appeal

Hartford did not cure the deficiencies of its earlier analysis after Ms. Krum appealed her decision.  As the court has described above, Ms. Krum provided Hartford with an updated APS

from Dr. Pearce in which he stated that Ms. Krum was "totally disabled" and "not expected to improve or return to any work." Ms. Krum also gave Hartford a further explanation of her condition and explained that she was unable to move about her house without frequent rest and concentrated oxygen.

Hartford did not have an additional physician evaluate Ms. Krum in person, but instead sent her records to Dr. Onwubueke for review. Dr. Onwubueke noted that Ms. Krum's pulmonary functions (as measured by the FEV1 rate) were 35% of normal and that Ms. Krum also suffered from back pain that made it difficult to sit. She stated that Dr. Pearce believed that Ms. Krum was totally disabled from performing her job and that, when pressed, Dr. Pearce ultimately maintained that Ms. Krum could not perform even minimal sedentary activity due to her severe COPD. Dr. Onwubueke also summarized her conversation with Dr. Bingham, who said that Ms. Krum was limited to sitting for an hour at a time because of her back.

Disagreeing with the findings of Ms. Krum's treating physicians, Dr. Onwubueke found that Ms. Krum retained the ability to perform sedentary work and should be able to sit for at least eight hours if she were able to take breaks. But Dr. Onwubueke also provided several caveats. She cautioned that Ms. Krum's work environment would need to be conducive to the use of oxygen while working and that Ms. Krum would do better with slow-paced work activities. Dr. Onwubueke also noted that Ms. Krum was likely to have "exacerbations of her COPD, which may be unpredictable. At those times, she may not be able to work effectively."

Hartford did not perform any additional review once it received Dr. Onwubueke's report. Instead, Ms. Krum's "functionality as determined by the independent medical reviewer [Dr. Onwubueke] was compared to the prior Employability Analysis Report of February 16, 2011."

In its letter denying Ms. Krum's appeal, Hartford provided a list of the same jobs that Hartford had previously provided Ms. Krum to offer a representative sample of jobs for which Ms. Krum was qualified in Hartford's opinion.  Hartford did not evaluate whether these jobs still met the additional limitations described by Dr. Onwubueke, such as the need to have oxygen available and the need for slow-paced work activities.  Hartford also provided no explanation of why it was crediting Dr. Onwubueke's opinion over those of Ms. Krum's treating physicians.

Hartford also misquoted Dr. Pearce's evaluation of Ms. Krum.  According to Hartford, Dr. Pearce indicated that Ms. Krum could not work more than thirty hours.  Dr. Pearce actually said that Ms. Krum could not walk more than thirty feet.[8]  Hartford's error highlights not only its lack of care in its evaluation of Ms. Krum's record but also its failure to address one of the more important pieces of evidence in her case.  Even if Ms. Krum is able to sit at a desk with occasional breaks, Hartford has not explained how Ms. Krum is expected to arrive at that desk. Ms. Krum does not simply have the inability to walk far distances, a condition that is faced and ably overcome by many Americans.  Instead, Ms. Krum encounters the more serious problem that even minimal efforts in movement result in severe oxygen depletion, a fact that is undisputed by the doctors who evaluated her.  Hartford did not address whether any of the job possibilities it listed were still available for Ms. Krum given her pronounced lack of mobility.

The court does not lightly overturn Hartford's decision, as the court is mindful of the high bar imposed by the arbitrary and capricious standard.  But here, considering the totality of the circumstances, the court cannot find a reasoned basis on which Hartford's decision was

---

[8]Dr. Onwubueke made a similar mistake in her report.  As the court has noted above, however, the court finds that Dr. Onwubueke's mistake was unintentional and did not likely have an effect on her report.

predicated.  While Hartford is able to cite some support from the opinion of its independent

physician, Dr. Onwubueke's report must be viewed in light of the countervailing opinions of Ms.

Krum's treating physicians and the SSA, as well as the qualifications that Dr. Onwubueke herself

included in her report.  The court finds that Hartford did not adequately evaluate or discuss the

countervailing evidence in Ms. Krum's record and thereby failed to provide her a full and fair

review as required under ERISA.  Moreover, the court finds that Hartford's decision was simply

wrong.  It is undisputed that Ms. Krum, a woman in her sixties, has severe COPD as well as

significant back problems and arthritis.  Her conditions are lifelong and she is not expected to

improve.  Ms. Krum requires oxygen throughout the day, has significant limitations on her

mobility, and needs a CPAP machine to maintain her oxygen levels.  She would face extreme

difficulties getting to and from a job even if she were able to find employment.  The court agrees

with Dr. Pearce and the SSA that Ms. Krum is unable to work and that, considering the totality of

the circumstances, Hartford's decision to the contrary was an abuse of discretion.

### 4.  Additional Factors Supporting the Court's Decision

Finally, the court notes that a number of additional factors support the court's decision.

The court has chosen to address these issues separately, as these factors are entitled to much less

weight than the factors discussed above and were not determinative in the court's decision.

Nevertheless, the court finds that these factors, particularly when considered together,

additionally counsel reversal of Hartford's decision.

First, even though Dr. Onwubueke disagreed with Dr. Pearce on the question of whether

Ms. Krum was able to perform sedentary work, Hartford chose to credit the opinion of the non-

treating physician (Dr. Onwubueke) over the treating physican (Dr. Pearce).  The Supreme Court

addressed this issue in *Black and Decker v. Nord* and held that nothing in the ERISA statute or in

the ERISA regulations promulgated by the Department of Labor required ERISA plan

administrators to give greater weight to the opinions of treating physicians than to the opinions of

other physicians when making benefit eligibility determinations. *Black & Decker v. Nord*, 538

U.S. 822, 825 (2003). But in dicta the Court noted that if the Secretary of Labor wished to

promulgate a "treating physician rule," such as the rule adopted by the SSA that Social Security

administrative judges must give more weight to opinions from the claimant's treating sources, 20

C.F.R. § 404.1527(d)(2) *et seq.* (2006), any court challenge to such a rule would be reviewed

under the deferential *Chevron* standard. *Id.* at 831-32 (citing *Chevron U.S.A. v. Natural Res.*

*Def. Council, Inc.*, 467 U.S. 837 (1984)). So while plan administrators need not favor the

opinion of treating physicians over non-treating physicians under current law, it is possible that

such a regulation could be adopted in the future. Indeed, similar regulations have been issued in

other contexts, such as the SSA.

      Of course, the court does not apply a treating physician rule here, but notes that in the

context of the above discussion it is unpersuaded by Hartford's counter-argument that Dr.

Onwubueke's opinion should be valued more highly than Dr. Pearce's opinion. Hartford

contends that Dr. Pearce may be biased because he knows Ms. Krum and is therefore more likely

to be moved by his natural sympathy for her and to represent her condition as starker and more

severe than it really is. The court sees no evidence in the record that Hartford's suggestion is

correct and notes that if any ulterior motives can be ascribed in this case, it is as likely that Dr.

Onwubueke is the more biased of the two doctors. As Ms. Krum argues, Hartford has a long

history with UDC and refers many cases to UDC for independent review. Ms. Krum questions

the independence of UDC's review, since UDC is paid by Hartford for its services (in Ms.

Krum's case, for instance, UDC received $700 to prepare its evaluation). The court has not

found any evidence that UDC was partial and struck from the record an affidavit submitted by

Ms. Krum's counsel about the relationship between UDC and Hartford. The court did so

because it found that additional evidence was unnecessary to demonstrate that UDC and Hartford

operate with an inherent structural conflict of interest. Since Hartford pays UDC for its reports,

it is entirely plausible that Hartford might choose a different company to perform this task if

UDC consistently recommended that Hartford overturn its benefits decisions. The court

reiterates that it has not found any evidence of bias in this case. But the inherent conflict of

interest between Hartford and UDC is an additional reason, even if a minor one, to be skeptical

of Dr. Onwubueke's recommendations, especially when her findings differ from the information

supplied by Ms. Krum's three treating physicians.

Similarly, it is undisputed that Hartford has an additional inherent structural conflict of

interest because it both acts as a fiduciary under ERISA and decides whether claimants qualify

for benefits under its Group Plan. Hartford argues that this conflict is minimal because Hartford

has taken appropriate steps to insulate its claims personnel from any consideration of Hartford's

finances. Indeed, the Tenth Circuit noted in an unpublished opinion that a district court in a

similar case involving Hartford "found that Hartford had taken steps to reduce potential bias and

to minimize any conflict of interest." *Brown v. Hartford Life Ins. Co.*, 428 Fed. App'x 817, 821

(10th Cir. 2011). The court does not disagree that Hartford may have taken these steps, but finds

that it does not have sufficient evidence to make an accurate determination of whether those steps

have been successful. In any event, Hartford's inherent structural conflict of interest is still a

23

thumb on the scale in favor of Ms. Krum's position, even if the court gives this factor little weight in its analysis.

### 5.  The Appropriate Remedy

When a court overturns a plan administrator's decision as arbitrary and capricious, the court may either remand the case to the plan administrator for a renewed evaluation of the claimant's case or order an award of benefits.  *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006).  "Which of these two remedies is proper in a given case, however, depends upon the specific flaws in the plan administrator's decision."  *Id.*  If the plan administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision, then the proper remedy is "to remand the case to the administrator for further findings or explanation."  *Caldwell v. Life Ins. Co. of North Am.*, 287 F.3d 1276, 1288 (10th Cir. 2002).  In contrast, "if the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate."  *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1194 (10th Cir. 2007).

Here, the court finds that not only did Hartford fail to adequately explain the grounds for its decision, but the evidence in the record clearly shows that Ms. Krum is unable to perform the essential duties of any occupation and is therefore entitled to benefits.

The court further finds that an award of prejudgment interest in this case is necessary to compensate Ms. Krum and that the equities in this case do not preclude the award of prejudgment interest.  *Caldwell*, 287 F.3d at 1286.  The prejudgment interest rate of 10% per annum provided by Utah Code Ann. § 15-1-1 is the most appropriate rate for this award.

CONCLUSION

For the reasons stated above, Ms. Krum's Motion for Summary Judgment (Dkt. No. 19) is GRANTED.  The court awards Ms. Krum reinstatement of her benefits retroactive to May 1, 2011, with a further award of pre-judgment interest under Utah Code Ann. § 15-1-1 and an award of reasonable attorney fees under 29 U.S.C. § 1132(g).  The court grants Ms. Krum's attorney fourteen days from the date of this Order to submit an affidavit detailing the amount of these fees.

SO ORDERED this 24th day of April, 2013.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge